MARSTON and another, Appellants, vs. DRESEN and wife, Respondents.

*May 24—June 21, 1893.*

(1) *Evidence: Exceptional state of facts.* (2–4) *Debtor and creditor: Husband and wife: Fraudulent conveyances: Evidence: Estoppel.*

1. If a remarkable and exceptional state of facts is satisfactorily proven, a court cannot refuse belief simply because it is out of the usual course of events.
2. The evidence in this case (stated in the opinion) is *held* to sustain findings of the trial court as to the possession of separate estate by the wife and its investment in the property which the husband's creditors seek to subject to the payment of his debts.
3. Real and personal property was purchased with the separate estate of the wife and the title was taken in the name of her husband, with the understanding that he would convey to her when she desired. Afterwards, while he was still solvent, he conveyed the property to her, without fraudulent intent on the part of either.

Such conveyance being attacked as fraudulent by creditors of the husband who had given him credit in reliance upon his apparent ownership of the property, it appeared that neither husband nor wife had made any representation· as to the title and neither knew that credit had been given the husband on the faith of his apparent title, and that the title had not been put in his name for the purpose of gaining credit for him. *Held,* that the conveyance to the wife was valid, and that she was not estopped to claim the ownership of the property as against said creditors. *Hopkins v. Joyce,* 78 Wis. 443, distinguished.

4. A wife intrusted her husband with money to be invested for her in lands and mortgage securities, and he, without her knowledge or consent, took title in his own name. As soon as she learned that fact she procured a conveyance of the title to herself. At the time of such conveyance the husband was indebted to other persons, but no part of such indebtedness was contracted on the faith or credit of his ownership of the property included in the conveyance, and he had not taken the title in his own name for the purpose of obtaining credit. *Held,* that the conveyance was valid as against his creditors.

APPEAL from the Circuit Court for *La Crosse* County.

Action in the nature of a creditors' bill. The defendants are husband and wife. The plaintiffs are judgment creditors of the firm of Dresen & Fjelstad, of which firm defendant *Hubert Dresen* was a member, and this action is brought to set aside certain transfers of real and personal property from *Hubert* to *Josephine Dresen* as being·in fraud of *Hubert's* creditors. At the close of the trial the circuit judge made findings as follows:

"(1) That in the fall of 1881 the defendant *Hubert Dresen* and one Andrew Fjelstad entered into copartnership in the retail grocery business at the city of La Crosse under the firm name of Dresen & Fjelstad, which partnership continued until about the 1st of January, 1887, said Andrew Fjelstad being the business manager of said firm; and while so engaged in such business said Dresen & Fjelstad had dealings with, and in course of trade purchased goods and merchandise of, the plaintiffs, who.were whole-

sale grocers in said city.  That on the 27th day of November, 1888, the plaintiffs obtained judgment in the circuit court of La Crosse county against said Dresen & Fjelstad for the sum of $871.19 and costs of suit, upon an indebtedness incurred by them in said business, and upon which said judgment execution has been issued and returned unsatisfied.

"(2) That prior to the 27th day of March, 1883, the defendant *Josephine Dresen,* acting through her husband and trusting to his judgment, purchased with her own money the following real estate mentioned and described in the complaint in this action, viz.: Lots three (3), six (6), and seven (7) in block eight (8) of Southeastern addition to the village of North La Crosse, according to the recorded plat thereof, the consideration paid for said premises being the sum of $190; also, lots four (4) and five (5) in block eight (8) of said Southeastern addition to the village of North La Crosse, the consideration paid therefor being the sum of $100; also, fractional lot number three (3) of section twenty-nine (29) in township sixteen (16), range seven (7) west, in the county of La Crosse, Wis., for the sum of $100,— and also, acting through her said husband and trusting to his judgment, loaned and invested certain moneys of her own upon the following mortgages and mortgage securities mentioned and referred to in the complaint, viz.: A certain mortgage given by John Bamberger and wife for the sum of $200; a mortgage of Henry Erickson and wife for $250; a mortgage of John Asslin and wife for $500; a mortgage of Louis Perious for $125, recorded in volume 25 of Mortgages, on page 511, in said La Crosse county; a mortgage of John Neagle and wife for $600; a mortgage executed by Michael Lambert to Abe Chavalier for $160; a mortgage executed by August Freimark and wife to Joseph Fay for $400.

"(3) That the money paid for said real estate and in-

vested in said mortgage securities was derived by said *Josephine Dresen* from her own separate estate, and no part thereof was received by her from or through her husband. That the title of said .real estate and said mortgages was taken in the name of defendant *Hubert Dresen* for the use and benefit of said *Josephine Dresen*, and with the express agreement and understanding between said parties that said *Hubert Dresen* should convey such real estate and assign said mortgages to said *Josephine Dresen* at any time she so desired. That such title was not taken in the name of said *Hubert Dresen* for the purpose of enabling him to obtain credit, and said *Josephine Dresen* had no` knowledge that any credit was ever extended either to him or to the firm of Dresen & Fjelstad by reason thereof.

"(4) That on the 27th day of March, 1883, the defendant *Hubert Dresen*, upon demand of said *Josephine Dresen*, pursuant to and in consideration of such agreement between said parties, conveyed to her the aforesaid real estate, and assigned to her said mortgages, together with a certain other mortgage mentioned in the complaint, executed by John Asslin and his wife for the sum of $800, and recorded in volume 16 of Mortgages, on page 475, in said La Crosse county, and for which said last-named mortgage the said *Josephine Dresen* paid full value to said *Hubert Dresen*, out of her own separate estate, at the time of such assignment. That the consideration expressed in said deed of conveyance was one dollar, love, and affection, and that said conveyance and said assignment of mortgages were duly recorded in the office of the register of deeds of said La Crosse county.

"(5) That, at the time of execution of such conveyance of real estate and assignment of said mortgages from said *Hubert Dresen* to said *Josephine Dresen*, the aforesaid firm of Dresen & Fjelstad ` was indebted to the plaintiffs and other persons with whom they had been dealing, in

the aggregate sum of about $2,500, such indebtedness to the plaintiffs being about $1,209.42, and at said time the stock in trade of said Dresen & Fjelstad amounted to about $1,500, and their book accounts and credits to the face amount of about $2,500, and that the property then remaining in the ownership of said *Hubert Dresen*, in addition to his interest in said store, consisted of about $3,000 in cash in his personal possession, which he took west with him shortly thereafter and invested in speculation and mining, and which said investment is now understood to be of little or no value. That before the plaintiffs commenced dealing with said Dresen & Fjelstad they ascertained, from inquiries and examination of the records in the register of deeds office in said La Crosse county, that the record title of the aforesaid mortgages and real estate was in said *Hubert Dresen;* and when plaintiffs commenced giving credit to said firm they believed said *Dresen* to be the owner of said real estate and mortgages, and relied upon such apparent ownership in giving the firm credit.

" (6) That at the time said inquiries were made by plaintiffs, and up to the time they so obtained judgment, the said Andrew Fjelstad had no property subject to execution, except his interest in said store and mercantile business.

" (7) That plaintiffs did not know of the conveyances and assignments aforesaid made by *Hubert Dresen* to his wife until suit was brought in February, 1888, on the notes for which said judgment was obtained.

" (8) That subsequent to the time of the aforesaid conveyance of real estate and assignment of mortgages said *Hubert Dresen* and Andrew Fjelstad continued in business as hereinbefore stated, and during all the said time continued to trade and have dealings with the plaintiffs, and had a running account with them for merchandise purchased in said business. That in the course of said dealings with Dresen & Fjelstad the latter paid to the plaintiffs, upon ac-

count, more than the sum owing from them to the plaintiffs at the time such conveyance and assignments were made, but, owing to the continual purchase of new goods, the amount owing upon such account was at no time reduced below the sum of $800.

"(9) That in the year 1884 the defendant *Josephine Dresen* intrusted with the defendant *Hubert Dresen* certain moneys of her own to be invested in the purchase of real estate and loaned upon mortgage securities, and that said *Hubert Dresen*, as agent for said *Josephine Dresen*, invested said money in the purchase of the following described lands and premises mentioned in the complaint, viz.: Lot number one (1) in block fourteen (14) of the Northern addition to the village of North La Crosse, according to the recorded plat thereof, the consideration paid therefor being the sum of $485; also, lot number two (2) in block twenty-one (21) of the original plat of the village of North La Crosse, according to the recorded plat thereof, the consideration paid therefor being the sum of $300,— and also loaned the sum of $300 to one Patrick Kaveny, and took a mortgage therefor, which was recorded in volume 28 of Mortgages, on page 577, in said La Crosse county. That all of the money paid for said real estate and loaned upon said last-mentioned mortgage was derived by said *Josephine Dresen* from her own separate estate, and no part thereof was derived from or through her husband.

"(10) That said *Hubert Dresen*, without the knowledge or consent of said *Josephine Dresen*, took the title of said real estate and said mortgage in his own name. That said *Josephine Dresen* did not ascertain such fact until the latter part of December, 1885, or fore part of January, 1886. That she thereupon demanded that the title of said real estate and mortgage be conveyed to her, and that the same was conveyed to her by said *Hubert Dresen* on the 13th day of February, 1886, and that the deed of said real estate and

assignment of said mortgage from said *Hubert Dresen* to her were at once recorded in the office of the register of deeds in said La Crosse county.

"(11) That at the time of said last-mentioned conveyance and assignment of said mortgage the said firm of Dresen & Fjelstad was indebted to the plaintiffs, but that no part of such indebtedness was contracted on the faith or credit of said *Hubert Dresen* being the owner of said mortgage or any of the property included in said conveyance. That said *Hubert Dresen* did not take the title to said property in his name for the purpose of procuring or obtaining credit.

"(12) That said Dresen & Fjelstad continued in business as copartners, and continued to deal with the plaintiffs as such, until about the first of January, 1887, at which time they dissolved partnership, the said *Hubert Dresen* retiring from said firm; and the said Andrew Fjelstad continued to carry on said business in his own name, which fact was known to plaintiffs at the time. That after such dissolution the said Andrew Fjelstad continued to carry on such business in his own name, and continued dealing with the plaintiffs in said business, until about the time (6th day of January, 1888) when he failed and made a general assignment for the benefit of his creditors. That during the time said Fjelstad carried on said business after said dissolution of copartnership he in fact paid to the plaintiffs various sums of money, but such moneys were applied at the times of payment largely upon payment for new purchases of merchandise made by said Andrew Fjelstad, leaving the old indebtedness, which had been renewed from time to time, due from said Dresen & Fjelstad at the time of their dissolution, upon which the aforementioned judgment against said Dresen & Fjelstad was recovered.

"(13) That none of the conveyances of real estate or assignments of mortgages above mentioned and set forth

were made with intent on the part of either of the defendants to defraud the plaintiffs or any creditor of said *Hubert Dresen.*

" (14) That the mortgages herein described were of the value of $3,035, and the herein-described real estate of the value of about $2,600, when conveyed and assigned as aforesaid.

" (15) That from the real estate deeded as aforesaid the defendant *Josephine Dresen* has realized by the sale the sum of $3,350, and from said mortgages the sum of $3,035.

" (16) That the defendant *Josephine Dresen* has undisposed of, of said real estate, the following, to wit, lots 4, 5, 6, and 7 of block eight (8) of Southeastern addition to the village of North La Crosse.

" (17) That defendant *Josephine Dresen* is, and was at the times herein mentioned, the wife of the defendant *Hubert Dresen.*"

" And as conclusions of law this court finds and determines (1) that all of said conveyances of real estate and assignments of mortgages from the defendant *Hubert Dresen* to said *Josephine Dresen* are upon a valid and sufficient consideration, and said *Josephine Dresen* is not estopped from claiming title thereto as against the plaintiffs as creditors of said *Hubert Dresen;* (2) and that the defendants are entitled to judgment herein, dismissing the complaint of the plaintiffs, with costs. Judgment is ordered to be entered accordingly."

From judgment for the defendants, plaintiffs appeal.

For the appellants there was a brief by *Winter, Esch & Winter,* and oral argument by *Frank Winter.* Upon the question of estoppel they cited *Hopkins v. Joyce,* 78 Wis. 443; Wait, Fraud. Conv. § 305; *Beecher v. Wilson,* 84 Va. 813; *City Nat. Bank v. Hamilton,* 34 N. J. Eq. 158; *Anderson v. Anderson,* 80 Ky. 638; *Doak v. Bunyan,* 33 Mich. 75; *Savage v. Murphy,* 34 N. Y. 508.

For the respondents there was a brief by *Paul W. Mahoney*, attorney, and *Bleekman & Bloomingdale*, of counsel, and oral argument by *F. H. Bloomingdale*.

WINSLOW, J.   The first contention of appellants is that the findings of the circuit court as to the possession of separate estate by the wife and as to the investment thereof in the real and personal property in controversy are contrary to the weight of the evidence, and that, on the contrary, the evidence shows that all of such property was purchased by the husband with his own moneys; and they say that the testimony as to the sources and origin of the wife's alleged separate estate is absolutely incredible. If this contention be well founded, then the judgment manifestly cannot be sustained, because in a contest of this nature between the wife and the creditors of the husband, where the wife claims title to property by transfer direct from her husband, the wife must first establish the fact by satisfactory and clear evidence that she had a separate estate which she used in acquiring the property. *Gettelmann v. Gitz*, 78 Wis. 439.

It must be admitted that the wife told a very remarkable story as to the acquisition of her alleged separate estate. This story was, in substance, that she came to this country from France in 1868,— she being then twenty-five years of age,— with her father, mother, one brother, and two sisters; that her father taught school and had land in France; that he brought to this country 30,000 to 35,000 francs in gold, which she testifies was sewed up in the clothes of her father and mother and herself.   This money, she alleges, was changed to paper when they arrived in this country, at a premium of from forty to fifty cents.   Of this money, 1,400 francs, she says, was her own, willed to her by her godmother, one Christina Staley, and given to her father to take care of.   The family went first to Mani-

towoc, where she says the father bought a house and lot for $2,200. After living at Manitowoc a few months, he moved with the family to St. Mary's Ridge, Monroe county, and soon bought eighty acres of land for $1,600, and started a saloon, grocery, and tavern, besides teaching school for two winters. This $1,600 was loaned to the father by Nicholas Staley, *Josephine's* uncle, although the father still had the money he had brought from the old country, uninvested. In 1870 *Josephine* married the defendant *Hubert*, who was then working on a railroad, and left home and lived thereafter in La Crosse, and immediately began to buy lots with money which she says her father gave her, in sums running from $100 to $350, during the years from 1870 to 1874. In 1874 her father sold out the place at St. Mary's Ridge, and came to La Crosse, with his wife, and commenced to live with *Josephine*, and continued to live with her until his death in 1886. He gave *Josephine*, as she testifies, $500 as soon as he came to live with her, and also other sums on subsequent occasions, which she invested in real estate or mortgages. All of these investments, prior to March, 1883, amounted to about $3,000; and she testifies that in all cases she gave the money to her husband with the understanding that he was to invest it and manage it in his own name and transfer the property to her when she so desired. It appears that *Hubert* managed the property and dealt with it in many ways as if it were his own. *Hubert* was a railroad brakeman when married, at $45 or $50 a month, and continued to work for the railroad until 1880, when he was getting $60 to $70 a month, and supported his family. In 1880 he went into business with Fjelstad, putting in at first $680 as capital, and in 1884 about $300 more. Fjelstad was the manager of this business. He fully corroborates his wife as to her advances of money with which he purchased the real estate and mortgages in question. Both husband and wife testify

that, in 1883, *Dresen* determined to go west, and before going his wife demanded the transfer to her of the real and personal property which her money had bought, and the transfers were made. Testimony was given tending to show that both *Dresen* and the firm of Dresen & Fjelstad were perfectly solvent at this time, and the circuit court so found, with which finding we agree.

Now, as we have said, this story is in many respects remarkable, but we certainly are not prepared to say that it is incredible. More remarkable instances of the secretion of money come to light every day than the one which is here detailed. It frequently happens that people in the class of life to which these people evidently belonged have an abnormal distrust of banks and of investments of all kinds, and keep their money uninvested, as *Josephine's* father is alleged to have done in this case. If evidence is to be always disbelieved because the story told seems remarkable or impossible, then a party whose rights depend on the proof of some fact out of the usual course of events will always be denied justice simply because his story is improbable. Such is not the rule. A remarkable and exceptional state of facts may be satisfactorily proven, and if so proven a court cannot refuse belief simply because it is out of the usual course of events. The circuit court, after hearing all the evidence, believed the defendants' statements to be true; and we cannot, after careful reading of the evidence, say that his finding in this respect was wrong, and we concur therein. The circuit court also found that none of the conveyances or transfers attacked were made with intent on the part of either of the defendants to defraud the plaintiffs or any creditor of *Hubert*, and such is also our conclusion from the evidence.

It being, then, satisfactorily established that the wife had a separate estate with which all the property in question was bought; that title to the property was taken in the

husband's name with the understanding that he would convey to his wife when she desired; and he having conveyed when solvent and without fraudulent intent on the part of either,— no reason is perceived why the transfers should not be upheld as against the creditors of the husband. But another contention is made by plaintiffs at this point which requires notice. The fact was, as the circuit court found, that before the plaintiffs commenced to deal with Dresen & Fjelstad they learned, by examination of the records, that the title to said real estate and mortgages was in *Hubert Dresen*, and that they relied on such apparent ownership in giving him credit, and that they did not know of the transfers from *Dresen* to his wife until they brought suit on the firm notes in February, 1888. The court also found, as the fact seems to be, that *Josephine* had no knowledge that credit was extended to her husband or to the firm on the faith of such apparent title in her husband, and did not put the title in his name for any such purpose. Upon these facts the contention is made that *Josephine* is now estopped from claiming ownership of the property, and the doctrine of the case of *Hopkins v. Joyce*, 78 Wis. 443, is relied upon. In the case last cited the wife's property was put in the husband's name for business convenience, and the husband represented, for the purpose of gaining credit, that he owned such property, and credit was extended to him on the faith of that representation. It was held (the husband having no other property) that the wife was estopped, as against the creditor so misled, from asserting her equitable title. That case differs from this in the very material fact that there was in that case an actual fraudulent misrepresentation, which the wife had put it within the power of her husband to make, and upon the faith of which (the husband having no other property) the creditor extended the credit; whereas in this case there was no representation made by any one, and the husband

made the conveyance while entirely solvent. True, the records showed title in the husband, and the plaintiffs relied on that showing; but neither of the defendants knew that plaintiffs relied thereon, and had plaintiffs applied to *Dresen* for information it may well be that he would have informed them of the condition of the equitable title. It does not appear, to use the language of Chief Justice MARSHALL in *Sexton v. Wheaton*, 8 Wheat. 229, that the wife was "herself the instrument of deception," or that she "contributed to its success by countenancing it." We are referred to no case which carries the doctrine of estoppel so far as the appellants contend it should be carried in this case, and we decline to do so.

So far, in this opinion, we have discussed questions relative to the validity of the transfers of March, 1883. Much that we have said applies with equal force to the conveyance of February, 1886. So far as the facts relating to the last-named transfer differ from the facts surrounding the conveyance of 1883, we agree with the conclusions of the circuit court, and detailed discussion thereof is unnecessary.

It follows from what has been said that judgment for the defendants was rightly rendered.

*By the Court.*— Judgment affirmed.